UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

* * * * * * * * * * * * * * * *
UNITED STATES OF AMERICA,                ) Criminal Action
                                         ) No. 22-182-02
vs.                                      )
                                         )
DAVID CHARLES JOHNSTON,                  ) December 16, 2022
            Defendant.                   ) 9:37 a.m.
                                         ) Washington, D.C.
                                         )
* * * * * * * * * * * * * * * *

**TRANSCRIPT OF SENTENCING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT CHIEF JUDGE**

<u>**APPEARANCES**</u>:

FOR THE GOVERNMENT:
                    ASHLEY AKERS
                    DOJ-CIV
                    Commercial Litigation Branch
                    1100 L Street Northwest
                    Washington, DC 20530
                    (202) 353-0521
                    Email: ashley.akers@usdoj.gov


FOR THE DEFENDANT:
                    CHRISTOPHER JOHN GRAMICCIONI
                    Kingston Coventry LLC
                    460 King Street, Suite 200
                    Charleston, SC 29403
                    (908) 216-0582
                    Email: chris@kingstoncoventry.com


ALSO PRESENT:       ANDRE WILSON, U.S. Probation


Court Reporter:     Elizabeth Saint-Loth, RPR, FCRR
                    Official Court Reporter


Proceedings reported by machine shorthand.
Transcript produced by computer-aided transcription.

**P R O C E E D I N G S**

THE COURTROOM DEPUTY:  Matter before the Court, Criminal Case No. 22-182-02, United States of America versus David Charles Johnston.

Your Honor, Pretrial Agent Christine Schuck is participating remotely.

Counsel and probation officer, please come forward and state your names for the record.

MS. AKERS:  Good morning, Your Honor. This is Ashley Akers for the United States.

THE COURT:  Yes.  Good morning, Ms. Akers.

MR. GRAMICCIONI:  Good morning, Your Honor. Chris Gramiccioni, Kingston Coventry LLC, on behalf of Mr. Johnston.

THE COURT:  All right.  And good morning, Mr. Johnston, too.

THE DEFENDANT:  Good morning, Your Honor.

THE COURT:  All right.  So we're here this morning for --

THE COURTROOM DEPUTY:  The probation officer.

THE COURT:  And the probation officer.  Sorry, Mr. Wilson.  Go ahead.  Put yourself on the record.

MR. WILSON:  Good morning, Your Honor. Andre Wilson for probation.

THE COURT:  Yes.  Thank you, Mr. Wilson.

Okay.  So we're here this morning for the sentencing of David Charles Johnston.  He entered a plea of guilty on September 23, 2022, to Count 4 of the information against him, charging him with parading, demonstrating, or picketing in a Capitol Building in violation of 40 U.S.C. Section 5104(e)(2)(G).

I am going to begin this morning with reviewing all of the materials that I have reviewed in connection with sentencing.  I, of course, have reviewed the probation office's presentence investigation report and sentencing recommendation docketed at ECF Nos. 38 and 39.

I have also reviewed the sentencing memo submitted by the government docketed at ECF 40, and all the ten videos that were submitted in connection with the plea in this case, and then the more recently submitted nine videos and images submitted by the government as well as.  The original videos were noticed and listed in ECF 29; and the more recent videos, in connection with sentencing, were summarized at ECF 42.

I have also reviewed the sentencing memorandum submitted on behalf of the defendant.  And I think we're up to 11 letters submitted in connection with Mr. Johnston's sentencing, all of which are docketed at ECF 43, and then the most recent letter docketed at ECF 46.

Does the government have all of those documents?

MS. AKERS:  Yes, Your Honor.

THE COURT:  And, Mr. Gramiccioni, do you have all of those documents?

MR. GRAMICCIONI:  Yes, ma'am, I do.  Thank you.

THE COURT:  All right.  So, Mr. Johnston, let me just tell you how this sentencing hearing will proceed.  The sentencing hearing will proceed in three steps.

At the first step, I will determine whether any party has an objection to anything set out in the presentence investigation report; and, if so, I will resolve those objections.

At the second step, I will hear from the government, then I will hear from your counsel; and then I can hear directly from you, if you wish to speak to me directly about sentencing in your case.

And then, at the last step, I will explain the sentence I am about to impose and impose sentence, and explain how I am applying the factors set out at 18 U.S.C. Section 3553(a).

Do you have any questions about how the sentencing hearing will proceed?

MR. JOHNSTON:  No, Your Honor.  I understand.

THE COURT:  Okay.  You may be seated.

Okay.  Starting with the presentence investigation report.  I understand the government has no objections to

any of the factual or other determinations set out in the PSR; is that correct?

MS. AKERS:  That's correct.

THE COURT:  And, Mr. Gramiccioni, have you and your client read and discussed the PSR?

MR. GRAMICCIONI:  Yes, Your Honor.

We have thoroughly reviewed and discussed it.  We have no objection as well.  Thank you.

THE COURT:  Okay.  Thank you.

And, Mr. Johnston, can you just stand right where you are.

Are you fully satisfied with your attorney in this case?

THE DEFENDANT:  Yes, Your Honor.  I am.

THE COURT:  And do you feel that you have had enough time to talk to your lawyer about the presentence investigation report and all of the papers submitted in connection with your sentencing this morning?

THE DEFENDANT:  Yes, Your Honor.  I did.

THE COURT:  Okay.  Thank you.  You may be seated.

So hearing no objection from either side, the Court will accept the factual portions of the presentence investigation report as undisputed and as my findings of fact at sentencing, as supplemented by my own review of the video exhibits submitted in this case and additional

communications made by the defendant that are summarized in the government's sentencing memo.

So we're now at the third step of the hearing, where I will -- or the second step of the hearing, where I will turn to the parties to talk about sentencing in the case.

I do have divergent sentencing recommendations here.  The government is recommending 42 days of intermittent incarceration and 36 months' probation, and $500 in restitution.  The defendant is requesting the same recommendation that probation is making.  And the probation office is recommending 12 months of probation, plus a $1500 fine, and a $500 restitution payment.  Although, I am not sure that the defense is concurring in the recommended fine but, at least, has said that the defense concurs with probation about the 12 months of probation.

But I will start with the government here.

MS. AKERS:  Thank you, Your Honor.

And may it please the Court.

The government's sentencing recommendation is based on all of the factors set forth in 3553(a), but I would like to highlight some of the relevant conduct and aggravating factors in this case that warrants the sentence that we're making.

And before I begin, is it okay if I remove my mask

if I'm fully vaccinated?

THE COURT: You're fully vaccinated, and you're feeling fine?

MS. AKERS: Yes.

THE COURT: Okay.

MS. AKERS: Thank you.

When looking at the factors -- 3553(a) factors, the Court should first consider what the defendant did in his individual capacity when he partook in the events of January 6th.

The defendant participated in this riot as an attorney, and I focus on that; and it's important in this case because it sets this defendant apart from almost every other defendant and rioter who participated in January 6. He had been a practicing attorney for at least ten years and, as such, he was well-equipped to know the illegality of his conduct, and the consequences that would follow. Everyone should have known better from their participation, but an attorney certainly should have known better; and that's what happened on January 6th.

What followed that, in his counseling to his now codefendant -- not to be cooperate with law enforcement, to keep his mouth shut -- was using his legal acumen to really further the crimes that they undertook and participated in.

Even though he knew what was wrong, he was scared

that the Democrats were going to get revenge and use their facial-recognition technology.  He knew what he did was wrong.  He didn't come forward and he didn't self-report to the board until he was caught, essentially.

And so his individual conduct in --

THE COURT:  His communication to his codefendant was:  Don't talk unless they give you immunity.

So isn't that, in some ways, sort of a reflection of how serious he thought -- unserious he thought his offense conduct was on January 6th, that he thought the government would think he was entitled to some kind of immunity?

MS. AKERS:  Well, Your Honor, I don't know what the defendant thought, but it suggests that he thought he had something to offer because he said:  In exchange for immunity he would provide some help.  I don't know what he thought he could provide to the government.

I don't think that this defendant actually had much of anything to provide.  He -- he doesn't have any associations with extremist groups.  He doesn't have any other ties on anything that the government would actually be interested in, I believe, in this case.

But it does show that he knew what he did was wrong; he knew what his codefendant did was wrong.  He is an attorney, of course he knew; and he participated anyway.  So

that's important.

The second thing that I think is important for the Court to consider is that while the defendant has accepted the plea and accepted responsibility for the one count that we offered him in the plea agreement, he does continue to display an inability to accept his participation in January 6.  He maintains that he saw no violence, that he saw no unlawful contact or conduct; and that's just simply unbelievable, Your Honor.  It is incredible.

We have a video that his codefendant filmed around 2 p.m. when the defendant and his codefendant were on the west front of the Capitol.  And 2 p.m. is right when there was one line of officers with a bike rack in front of them and thousands of rioters almost breaking through to the Capitol.  And the defendant and his codefendant were at the very front of that; they were about five people back, about the length between me and Your Honor, between the officers and the bike racks and the Capitol Building behind them.

And what the defendant saw -- and we know because of the video that his codefendant filmed -- was utter chaos.  We heard sirens that were going off; there were flash-bangs that were going off.  The Metropolitan Police Department LRAD warning system was screeching and saying:  You have no authority to be here.

We saw rioters throwing objects at law

enforcement -- rioters who were standing right next to the defendant.  His codefendant said they saw them throwing batteries at law enforcement.  We saw rioters spraying chemical irritant at law enforcement.  We saw rioters screaming vulgarities and obscene comments at law enforcement, who were standing there just doing their job.

We saw, on the codefendant's video, an altercation when rioters tried to breach the -- the bike rack line; and we saw the bike rack thing being lifted up, and an officer swinging his baton and several other rioters trying to make it through that line.

He saw all of that; it was right in front of him. And yet, he progressed up the stairs to the upper west plaza and he pulled out his cell phone, and he brought his other codefendant over, and he said, "We have broken past the barriers, we have made it to the Capitol doors, this is the Capitol.

And his codefendant said, "The police have been overwhelmed."

They knew what they were doing and they saw all of this conduct, yet still chose to go in the Senate wing door. And --

THE COURT:  Can we just pause for a second because this defendant's plea letter, in paragraph 3, had a requirement that he cooperate and allow the FBI to look

through social media accounts on his phone or other device. According to the government, in a footnote -- so maybe the government didn't think this was very important because it was stuffed in a footnote only, not even in the text -- he provided a single photo -- outside -- from January 6, 2021.

And I can see on the videos he is pretty -- you know, he is pretty much using his phone in most of the video as he's walking around the inside of the Capitol.

So did the government pursue any more getting the videos he took on that day?

MS. AKERS:  Yes, Your Honor.  And that's a great point, and I think an important one.

THE COURT:  Why was it put in a footnote, then, as if it was not very important?

MS. AKERS:  Well, the reason it was put in a footnote -- and I will provide Your Honor some context -- is that we really don't know what happened to all of the videos that the defendant took.

We do know -- and Your Honor clearly saw also -- on almost all of the videos that we have of the defendant outside the Capitol and inside the Capitol, he's walking around filming.  And, in fact, we can see, in I believe supplemental Exhibit 4, an open-source video -- we can see his cell phone; and you can see that it says it's recording, it's the iPhone display.  So we know he was recording

videos.

We did not pursue a search warrant of his cell phone because, as Your Honor is aware, he is a practicing attorney. It's difficult to get a search warrant of a practicing attorney's cell phone; these are misdemeanor charges. My office, as you know, is very overwhelmed with these investigations, and so we didn't think that it was prudent to go through all of the process -- and there is a lot -- to get a search warrant for his cell phone.

But we did ask that he turn over any videos and pictures that he took. The defendant said that he believed that he had those on a flash drive or an external storage system. He looked for us. And he said that he could only come up with that one picture. And so --

THE COURT: Was he dissembling?

That makes no sense.

MS. AKERS: Your Honor, I agree. You can ask the defendant about it.

There's only inferences to be made. I have no evidence to suggest whether he deleted them, whether he didn't want to turn them over. I don't know. But we did pursue that.

And, luckily, his codefendant filmed almost everything, and they were essentially side by side throughout the day. So we still know what happened. We

know that he was filming.  And I think that that is certainly an aggravating factor, as I will talk about his conduct in the Capitol Building.  Not only was he watching certain things, he was filming it; it was important to him. And that is certainly aggravating.

So talking about his time in the Capitol Building -- which I think is incredibly important because the defendant maintains that, although he was in the building for 30 minutes, he was spending most of the time trying to leave; the video footage just simply doesn't support that story.

We know that the defendant went in the Senate wing door about ten minutes after it had been initially breached. Sirens were going off when he went in.  He met his codefendant, and they walked right and went into the Crypt. The Crypt had just been overwhelmed by a mob of rioters and had overtaken a police line right as they were entering.

They took some pictures.  They hung out in the Crypt, they talked to people, and then they went into the Crypt lobby.

And this part is important and particularly aggravating because, at that point, law enforcement was trying to use every tool that they had, and they were putting down the rolling bay doors, essentially, doors that block hallways.

Law enforcement was trying to keep rioters out of the Capitol Building and from progressing further.  And other rioters were throwing chairs, were throwing objects, were putting themselves under the doors; and the safety stopped the doors, and they raised again.

When the defendant saw this, did he turn around and leave?  No.

What did he do?

He pulled out his camera, he got closer, and he filmed it.  So he knew full well that the hallways that he eventually walked through were not supposed to be open to the public and that law enforcement was actively trying to keep them out.

From there, he went back into the Crypt.

At this point, this would have been a great opportunity for him to have left because he was back at the original place where he started.  Other rioters were heading back toward the Senate wing door, he was standing right next to them.  But he didn't.  He was posing for pictures.  He was talking with other rioters; he was talking with his codefendant.  And then, after spending several minutes in there, he went back to the Crypt lobby.  So he progressed further into the building.

He walked right through the doorway where he saw the rolling bay doors trying to close, and he went into the

visitor center.

And in the visitor center, there was another confrontation between a line of officers and a group of rioters. And there started to become an altercation, it is apparent on the video.

And, again, what did the defendant do? He didn't leave at this point. He pulled out his camera, he started videoing. He went more to the center; he inched closer. Eventually, he was right up to the back of the rioter in front of him, right by the altercation that was going on.

Only after the officers in the visitor center were able to sort of corral -- they made sort of a semicircle and started to push the rioters out -- only then did the defendant try to leave the Capitol Building. This was about five minutes before he actually got out.

So up until then, we have 25 minutes of the defendant meandering around, taking pictures, watching altercations, videoing them in the Capitol.

On his way up the stairs back out of the Capitol, he was almost the very last rioter to progress up the stairs because he couldn't help but turn around and take another picture of the line of officers who were trying to corral all of the rioters out.

And so at that point he did make his way up the stairs eventually to the Senate wing door that had just been

breached again -- so there were a lot of people there.  It did take about two minutes for him to get out, climb out the window.

But his time in the Capitol, the 30 minutes, they were intentional.  He had every opportunity to leave.  He wasn't in tight quarters with groups where he couldn't move. He was freely roaming, freely taking pictures, and freely participating in his illegal venture throughout the building.  And that's important and certainly aggravating, given he was in there for 30 minutes.

The next thing, Your Honor, that I think is important to weigh, in addition to his individual acts, is just the context of January 6th.

I know Your Honor is well aware, but I think it's important to say:  January 6th was obviously a horrible day for our country.  It was a grievous attack on the Capitol that stopped the congressionally mandated certification of the Electoral College vote; it stopped and prevented the peaceful transition of power.  It led to hundreds of law enforcement who were injured, who died.  There were congressmen and women and their staffs who were frantically evacuated and in hiding for hours and hours.  And the Capitol Building -- the heart of our country and where, really, everything happens -- incurred millions and millions of dollars' worth of damage.  So this day was a terrible

one, and the defendant's actions and participation on January 6 contributed to that.

I think the really important thing to note here is that this was a riot; and this defendant on this day was a rioter. And in his sentencing memorandum, at least counsel, really takes issue with the government calling this a riot and calling the defendant a rioter.

It doesn't matter that he wasn't violent and that he didn't destroy property. Because the only reason the violent, destructive rioters were able to do the damage they did was because they had strength in numbers, because people like the defendant stood behind them and supported them and were able to sufficiently overwhelm the officers, overtake the officers, and break into the Capitol Building.

So the context of his individual actions, as an attorney who should have known better, should be -- should be really considered in light of the day as a whole.

And then just very briefly, I will touch on --

THE COURT: And in connection with that -- and I do plan to talk to defense counsel about some of the verbiage in the sentencing memo, about "riot."

But he spends a lot of time on the Anti-Riot Act, the federal Anti-Riot Act. And it's interesting to me because -- has the federal Anti-Riot Act been used in any of these January 6th cases?

MS. AKERS:  To my knowledge, it has not, Your Honor.

THE COURT:  Why is that?

MS. AKERS:  I am not sure, Your Honor.

I know that immediately after January 6th, the Department of Justice assembled a team of very brilliant legal minds, far above my pay grade, who made charging decisions.  I was not involved in those, and I'm not sure.

I know that's a question that has come up before.  And looking at the elements of the statute, I am not so sure it wouldn't be easy to convict all of these people of that crime.  But I'm not --

THE COURT:  Me, too.  That's how it strikes me, and it's been -- the constitutionality of it has been upheld across the board.

I mean, frankly, I think the question raised in the defense sentencing memo about -- and I think part of the point made in the defense sentencing memo is:  The government shouldn't be calling Mr. Johnston a rioter when he wasn't charged under the federal Anti-Rioting Act.

I think the better question is:  Why wasn't he?

Why isn't the government charging that?

Instead, we're getting parading and picketing, which has led to some confusion across the country about whether this was just a parading protest as opposed to a

riot.

And so I thought, before I get to defense counsel, to ask the government:  Why is it that you are choosing to charge parading, picketing, and demonstrating as opposed to the federal Anti-Riot Act?

MS. AKERS:  Yeah.  And, again, Your Honor, I wish I had a better answer for you --

THE COURT:  Well, take it back and just --

MS. AKERS:  I certainly will.

THE COURT:  -- I would actually like an answer to the question.

MS. AKERS:  I certainly will.  And it's a point well taken, absolutely, given --

THE COURT:  Let me ask one last question, unless you have something else you need to say -- this defendant has the ability to pay a fine.  He makes -- you know, I think the PSR says he makes, I think, over $200,000 a year; that's gross income for his family.

The probation recommends a fine of $1500; the government has no recommendation about a fine.  Even though this is a petty offense, it allows a fine up to $5,000.

What is the government's position on a fine here? $500 in restitution is enough; no criminal fine necessary?

MS. AKERS:  Your Honor, as a matter of consistency, the government isn't seeking fines in hardly

any of these cases.

It is certainly true that this defendant has more than --

THE COURT:  Well, the government is seeking fines when defendants have tried to make money off their offense conduct on January 6 by soliciting funds online.

MS. AKERS:  That is correct, Your Honor.

The only knowledge that we have of this defendant doing that is soliciting funds to pay for his legal fees.

My office's position is that is separate and apart from soliciting money to really --

THE COURT:  Oh, so this defendant has done that, too?

MS. AKERS:  To my understanding, yes, Your Honor.

And so it's just an office position and a policy that we're taking that -- unless, as Your Honor noted, a rioter is -- or a defendant is benefiting financially directly from his or her participation -- we, typically, are not seeking an additional fine.  Although, it is true, as Your Honor noted, that this defendant seems to have the ability to pay a fine.

I just wanted to touch briefly on two other points, the first is the defendant's history and characteristics.  I think it's obvious to acknowledge that this defendant has no criminal history.  This does appear to

be an isolated lapse in judgment, albeit a very drastic one. But we acknowledge that the defendant seems to contribute to his community, to his family, he has held a good and admirable job for his life.

I have had a chance to speak with the defendant. He seems to be a very good person, a smart person, but who made a mistake, for sure; and that goes to the concerns of both general and specific deterrence.

General deterrence is obviously incredibly important in all of these cases because people need to know that just because they're upset with something, an election or anything else -- they cannot storm the Capitol, they cannot break into the Capitol -- it's just unacceptable.

As it relates to specific deterrence, it would be surprising to me to see this defendant doing the same actions that he did on January 6th; I think that he realizes the gravity of it.  With that being said, his excuse is that he was curious.  And curiosity will come again and curiosity is certainly no excuse for breaking the law and certainly no excuse for breaking into the United States Capitol.  So there is certainly a need for both general and specific deterrence in this case.

And those are the factors that we would ask the Court to consider and that we think are appropriate in our recommendation.

THE COURT:  Okay.  Thank you.

Okay.  I will hear from defense counsel.

MR. GRAMICCIONI:  Thank you, Your Honor.

May it please the Court.

I appreciate the opportunity to advocate on behalf of my client, David Johnston.

Your Honor, I am going to briefly -- I have been by and large --

THE COURT:  Let me just start with the video evidence.  I just realized -- do you object to public release of the videos?

MR. GRAMICCIONI:  Only to a certain extent.  There are two recordings of which neither Mr. Johnston or his codefendant are depicted that are fairly inflammatory.  And then there is one -- a third recording where he is depicted in the first minute and 15 seconds.  And then the remaining video, which is around seven or eight minutes long, the recorder goes deeper into the crowd, further from where my client was.  So I object just on a very narrow basis.

THE COURT:  Your objection is overruled.

MR. GRAMICCIONI:  Okay.

THE COURT:  This defendant was part of a riot; he was a rioter.  And he only was able to do what he did because he was in the midst of a whole bunch of angry people

who had been directed down to the Capitol, many of them --
because they just attended the former President's rally and
he told them to go to the Capitol -- and they believed that
the 2020 presidential election was stolen and they were
going to the Capitol at the direction of a bunch of
different speakers at the Ellipse that this defendant
attended.  So his participation in this whole crowd helped
contribute to everything that happened that day.

Your objection is overruled.

I have articulated my reasons why all of the
evidence and videotapes that are underlying the pleas, the
sentences, in these January 6th-related cases, are important
to disseminate to the public so that to the extent that
there are people in this country who believe that what this
defendant did, and what other defendants did on January 6,
2021, was participate in a protest, they need to watch the
videotapes and see what that crowd was up to.

That objection is overruled.  I am going to be
issuing a minute order to make all of those videotapes
submitted in connection with the sentencing public.

All right.  So now let's go to what the
government's counsel already raised, which is your
sentencing memo -- which is almost amusing in some ways --
complaining again and again and again about the government
calling Mr. Johnston a "rioter" and calling other people

engaged in the offense conduct on January 6 -- some more egregious, some far less egregious than Mr. Johnston -- "rioters."

I mean, you say this in your defense memo on pages 3 and 4, and you say -- you contend the defendant did not participate in any riot activities.  You claim the government is relying on unconnected acts of other unnamed individuals rioting at the Capitol that day to discuss the defendant's conduct at the Capitol.

And what are we supposed to call physical overrunning of police lines, only because it is a mob, and breaking -- literally, breaking windows and breaking into the Capitol Building -- which was then a restricted area because there was a Joint Session of Congress and the Vice President was there, important things were going on in Congress that day -- what are we supposed to call that except a riot during an attack on the Capitol?

MR. GRAMICCIONI:  Your Honor, my client and I don't take issue with the -- the fact that it was a riot; and he appreciates that he was participating in a riot.

My concern --

THE COURT:  That makes him a rioter.

There is -- I mean, let me just quote to you from what the D.C. Circuit has said:  On January 6, 2021, a mob professing support for then-President Trump violently

attacked the United States Capitol in an effort to prevent a Joint Session of Congress from certifying the Electoral College votes designating Joseph R. Biden the 46th President of the United States.  The rampage left multiple people dead, injured more than 140 people, and inflicted millions of dollars in damage to the Capitol.  Then-Vice President Pence, senators, and representatives were all forced to halt their constitutional duties and flee the House and Senate Chambers for safety.

That's on pages 15 and 16.

On page 18, the D.C. Circuit describes how:  The mob quickly overwhelmed law enforcement and scaled walls, smashed through barricades and shattered windows to gain access to the interior of the Capitol.

The same page, in *Trump v. Thompson,* 20 F.4 10, D.C. Circuit 2021, the Circuit goes on to say:  As rioters -- rioters -- poured into the building, members of the House and Senate, as well as Vice President Pence, were hurriedly evacuated from the House and Senate Chambers.

In *Munchel*, the dissenting judge, Katsas, referred to the "rioters" and the "riot" at the Capitol that day.

And it's not just the D.C. Circuit.

The Third Circuit has also referred, in *Duka v. United States*, a 2022 case from the Third Circuit has also referred to the "January 6, 2021, United States Capitol

riot."

All of these circuits are wrong?

MR. GRAMICCIONI:  No.  No, Your Honor.  If I may --

THE COURT:  This defendant wasn't a rioter?

It wasn't a riot attacking the Capitol on January 6, 2021 --

MR. GRAMICCIONI:  No --

THE COURT:  -- is that what we're debating here in your sentencing memo?

MR. GRAMICCIONI:  No.  What we're debating, Your Honor, is obvious -- what I know is obvious to the Court and was pointed out in -- in the argument during government counsel's opportunity, is that while I completely appreciate, as does my client, that he was part of a riot, at the end of the day, it's important -- and the Court has already highlighted it -- he is not convicted of any federal rioting offense.

So my argument is along the lines of just ensuring that he is being particularly sentenced for the crime to which he pled and his conduct.

THE COURT:  Well, that's a little bit of a different point than you were making in your sentencing memo.  I thought in your sentencing memo it was -- not only was he not convicted of the federal Anti-Riot Act but, you

know, because he wasn't convicted of that -- wasn't even charged with that, how can we even call it a "riot"?

THE COURT:  I thought that was your argument.

MR. GRAMICCIONI:  Well, Your Honor --

THE COURT:  I thought that was your argument.

MR. GRAMICCIONI:  -- if I was imprecise, I can tell you this, that the context of that is -- I -- it is our argument that the government is trying to conflate Mr. Johnston's individual actions on that January 6th date with the worst and most egregious offenders.

And what I had my argument down here for is -- is apparent to the Court, and it's consistent with what probation has found -- is that while what he did was reprehensible and terrible, and he regrets that day and will regret that day for the rest of his life -- what he did not do is engage in violent or assaultive behavior.  He didn't touch or strike anyone.  He wasn't throwing objects at anyone, like a flagpole, trying to break in --

THE COURT:  But do you understand that if he had engaged in that conduct he would have been charged like the defendant I had pleading guilty earlier today --

MR. GRAMICCIONI:  Of course.

THE COURT:  -- to 18 U.S.C. 111(a)?

He would have been charged with something far different; and he would be facing, as the defendant earlier who appeared in front of me -- he's facing five years in

jail.

MR. GRAMICCIONI: Of course I do, Your Honor. But I agree --

THE COURT: So it's not -- I understand this defendant didn't carry weapons with him; he didn't personally physically assault a law enforcement officer. And to the extent that we have evidence presented -- and, of course, we don't have his -- the things he was recording, but his codefendant recording -- he wasn't physically breaking a line, other than the fact that he was in this mob, that they understood clearly because they say so on videotape -- they record themselves saying, "We overran the police to get inside this police."

So the fact that he didn't do certain things and is, therefore, not charged with a felony, he's only charged with a petty offense, I understand.

MR. GRAMICCIONI: Right.

THE COURT: And he is not facing felony time.

MR. GRAMICCIONI: I am well aware the Court understands.

And the reason I raise these arguments in my brief and today during oral argument is because there is an effort in the government's brief and argument to, essentially, conflate his actions with the most egregious. And I just want to make sure --

THE COURT:  I don't think that the government is doing that at all, actually.

I think your papers could be read as if this defendant didn't do anything really wrong; he was in the wrong place at the wrong time; he didn't engage in anything. You make reference to protests from the 1960s, as if he was just a protester.

Was I getting the wrong impression from your sentencing memo?

MR. GRAMICCIONI:  Yes, Your Honor.

And with due respect, I have to disagree.

My client, from day one, immediately accepted responsibility.  He was charged in mid-May.  And by the end of the summer season, in September, he was found guilty.

So one of my arguments that I wanted to address is the arguments about his not accepting responsibility, I just don't find that that is accurate here.

The government seems to think that just on the premise of the possibility that there was some investigation ongoing that, you know, Mr. Johnston was supposed to kind of effectively walk into an FBI office and say:  Hey, listen. I don't know what you guys -- you have going; but in case you have anything going, here I am.

That's just not the way the system works, Your Honor.  He was ready and willing --

THE COURT:  Actually, I have a number of defendants who did self-surrender, who did exactly that.

MR. GRAMICCIONI:  But it's not an obligation of his.  He was ready --

THE COURT:  No, it's no obligation.

MR. GRAMICCIONI:  He was ready and willing to speak to law enforcement, when and if they ever they contacted him, and, unfortunately, he was never given that opportunity.  He was just arrested.  And, you know, he was compliant and very complementary of the federal law enforcement officers that arrested him.

So that is a point that I -- that I am glad I was able to clarify with the Court.

I am certainly not going to preach to the Court about the 3553 sentencing factors; I know the Court is well aware.  But I did want to just identify a few things that I think are favorable to my client.

He's joined today, not just --

THE COURT:  Could you explain what happened to all of the -- all of the videos and photographs he was taking that day?

MR. GRAMICCIONI:  Yes.

THE COURT:  I mean, because --

MR. GRAMICCIONI:  Yes.

THE COURT:  -- was he just being coy or totaling

dissembling, turning over one photograph of him outside --

MR. GRAMICCIONI:  No.

THE COURT:  -- when I can see him walking around with his camera on the whole time?

MR. GRAMICCIONI:  No, Your Honor.

THE COURT:  Was he trying to protect other people who --

MR. GRAMICCIONI:  No --

THE COURT:  -- he may have captured on videotape --

MR. GRAMICCIONI:  No, Your Honor.

THE COURT:  -- inside the Capitol?

MR. GRAMICCIONI:  Not -- the furthest from.  In fact, government counsel even agrees, as she indicated, that he was forthright.

During -- at a debrief session which happened, like, two weeks ago, he was asked about that.  He went back -- he had taken the -- the photos off of his phone and stored them on a thumb drive back closer to the time of the event.  He conducted a diligent and thorough search, tried to find -- he looked at every single thumb drive that he found.  We found that one photograph; and that's the one that I sent to the government at their request.

So no, Your Honor, I don't want the Court to be misled.  There was no effort to try to obstruct, conceal,

delete, or destroy evidence; he just simply can't find it. And I would welcome the Court to ask him about it when he is able to speak with the Court directly.

As far as dissemination, that did not happen here.

Unlike many of the cases that appear before this Court, there was no planning -- other than just arranging to go with his neighbor, the codefendant.  There was no effort to whip up support for this rally before, during, or after.

He is not a social media animal, maybe that's -- and he will tell you, in large part -- based on his age, it's just a -- kind of a new -- more of a newer development. But I think it's important the Court note that as well because I have seen in many of the cases before it that there is a lot of that going on, and that's just absent here.

Unless the Court has questions, I will just proceed briefly with argument.

THE COURT:  Go ahead.

MR. GRAMICCIONI:  Thank you.

So I just wanted to point out that Mr. Johnston is joined by his lovely wife Shelly, his pastor from his church back home, and his two children.  And I want to thank you all for coming today in support of David.

THE COURT:  I know it's a sad day for his family.

MR. GRAMICCIONI:  Yes, ma'am.

Well, Your Honor, I know the Court is well aware of what the probation report says, but I did want to address some of the arguments by counsel. It is clear that rehabilitation is -- is not an issue here with Mr. Johnston.

I think he will tell you that, in his 66 years on this earth, this was his first and only criminal offense; he deeply regrets it. It's -- he's -- there is no -- he is not the kind of man that's coming in here trying to lay some kind of justification, like I know the Court has seen.

THE COURT: You know, this is an educated man.

MR. GRAMICCIONI: Yes, ma'am.

THE COURT: He is a lawyer. I agree with the government, it is an aggravating circumstance here that he was a practicing lawyer. He should have known so much better than everybody else in that crowd who wasn't a lawyer.

He breached police lines to go into a restricted building to disrupt a constitutionally mandated Joint Session of Congress. And he did so, why? Because he believed the 2020 presidential election was stolen? Did he believe political leaders who were saying that?

MR. GRAMICCIONI: Your Honor, I -- I completely agree with you. You are right about his status as a lawyer; he should have known better. It was an incredibly stupid error in judgment, not just as a legal professional --

THE COURT:  Well, was it an error in judgment because he believed political leaders saying that the 2020 presidential election was stolen?

MR. GRAMICCIONI:  I don't believe so, Your Honor. I think he was going down there, as -- as indicated by government counsel, just out of an incredibly stupid level of curiosity.  And I -- and I will point out --

THE COURT:  Because it is very concerning to me --

MR. GRAMICCIONI:  Yes.

THE COURT:  -- that, particularly, educated people believe this "Big Lie" that keeps being promulgated --

MR. GRAMICCIONI:  I thought the same --

THE COURT:  -- when there is no evidence for it.

And so people who are susceptible -- susceptible to believing conspiracy theories -- the number of defendants from January 6th who appear in front of me who believe in QAnon conspiracy theories is -- I mean, no one has done an accurate count, but these are people very, very susceptible to believing conspiracy theories, believing falsehoods told by political leaders.

When I see a defendant who first attended a rally and then -- following a rally where they were spewing falsehoods about a stolen presidential election, in pursuit and effectuating what he was told to do -- breaches the Capitol and joins a riot that causes the Vice President of

the United States and every member of Congress and staff to be evacuated, hiding under their desks in terror -- I get concerned. I get very concerned about rehabilitation and deterrence, and so -- for every single one of these individuals arrested in connection with offense conduct on January 6th because they went inside the Capitol.

So you say it with enormous confidence that I should have no concern about rehabilitation here, but not so fast. Not so fast --

MR. GRAMICCIONI: Well, Your Honor --

THE COURT: -- from where I sit.

MR. GRAMICCIONI: Understood, Your Honor.

I would just submit that it's not just me that feels like that, obviously the probation department does as well based on their interactions with him. The letters in mitigation that were submitted as part of our sentencing memo -- one of them is from a member of the Bar, who David was formerly affiliated with. I -- I would tell you, Your Honor, that he -- nobody is going to punish himself more than David as it pertains to this, especially because he is a lawyer.

It is -- the Court is aware that David self-reported to the South Carolina State Bar, so I hope that lends a level of confidence to his ability to be fully rehabilitated over this one isolated incident. He has

reassured me, and I know he will reassure you, that he will never have any intersection with the criminal justice system again.

So I -- it is a fair point to consider, you know, as part of the overall nature and circumstances of this individual defendant, but I know the Court is also well aware that there is -- there is no enhancement or otherwise under the U.S. Code or the sentencing guidelines, which I realize don't apply here, that pertain to an attorney; that's the only thing I would ask the Court to keep in mind. So...

THE COURT: But it's a very relevant -- it's a very relevant characteristic of the defendant --

MR. GRAMICCIONI: It is.

THE COURT: -- in conjunction with the offense conduct is.

MR. GRAMICCIONI: It is. But I would also submit equally, if not more so, just the fact that he is a family man, he has contributed greatly to society. Right -- right now he's working at a -- at a mortgage company that helps provide loans to low-income individuals; that's the CIG Group, the letter that was submitted most recently. Please accept my -- my apologies for the late sub- -- an error on that --

THE COURT: It's fine. I read it.

MR. GRAMICCIONI:  Thank you, Your Honor.

And he is -- he can contribute, like, to society and his community, like he has done so in the past.

I would just -- I would just -- I would characterize this as an outlier in the otherwise law-abiding life of somebody who is a family- and community-focused individual.

I just want to briefly touch upon some of the arguments about -- that were raised by the government counsel.

As it pertains to communications with his codefendant, Mr. Clifton, as the Court is aware, there is a long relationship, a friendly relationship, but also one in a legal-advice capacity, as Mr. Johnston had represented him on other matters in the past.  So, on often occasions, Mr. Clifton would come to Mr. Johnston to seek out his legal advice.  There wasn't, like, an engagement letter or a retainer agreement between them on this, but because he knew he was a lawyer he sought his advice out on certain occasions.

I guess I would respectfully take issue with the argument that there was some level of obstruction there in his communications with Mr. Clifton.  You know, he is giving legal advice.  I mean, "legal advice" -- generally, you could characterize it as sound.  While he used the improper

or imprecise terminology of "immunity," I believe what he was talking about is what -- what I have experience in the traditional course of federal matters is as a proffer, a king-or-queen-for-a-day letter.

You know, obviously, we can't control what the government does or does not do, but these communications happened months before there were ever charges filed.  And I just don't think the Court ought to give that much weight to that communication as it pertains to an obstruction argument.

And then the government also raises an issue -- excuse me, Your Honor -- about being side by side with Mr. Clifton.  The Court should know that it was melee there. The scene was chaotic, as the Court is well aware.

There were tens of thousands of people there; and because of that, Mr. Johnston and Mr. Clifton got separated on a handful of occasions.  So it's not fair to say that they were side by side every single time.

It's also not fair to characterize precisely what was derived from Chad Clifton's phone as what Mr. Johnston saw and observed.  I mean, they're two separate individuals in a chaotic environment, and it was just mass hysteria.

Mr. Johnston, who is all of five-foot-nine, had difficulty seeing over everything.  It's not to take away from the fact that he was in a sea of rioters and

participating in one, as the Court pointed out. But just because Clifton might have seen something doesn't necessarily mean that Mr. Johnston is not being forthright by saying he doesn't recall seeing that. That's the point I wish to raise with the Court. I would encourage the Court to probe Mr. Johnston on that, if necessary, on that further point.

So I will just conclude, unless the Court has any questions -- I know the Court is well aware that these -- these defendants in these cases ought to be sentenced on their individualized conduct, and that's kind of challenging considering the backdrop.

As it pertains to specific deterrents, I have made my argument that I don't believe that's going to be an issue with Mr. Johnston.

General deterrence, candidly, it is -- it's a point in favor of the government. How the Court weighs that out, I know it's best suited to do so. I would just ask that the Court consider having mercy on this 66-year-old man who made a terrible, terrible decision by committing this crime.

Unless the Court has any questions, I will -- I will turn it over to --

THE COURT: No. I will hear from Mr. Johnston now.

MR. GRAMICCIONI:  Your Honor, if I may add one point -- I'm so sorry.

Of course, we're seeking a noncustodial sentence consistent with what probation recommends.  But if the Court is inclined to seek custody, we would respectfully ask that the Court might consider home detention, or if it's going to be at a -- at a federal facility, to have Mr. Johnston serve it all at once to avoid the problem that we outlined with the quarantining practice by Bureau of Prisons.

THE COURT:  Yes, but I inquired of my probation office.  And what my probation office informs me is that that is incorrect, and that the download that you got from the BOP website is incorrect.

And at the Charleston Detention Center there is no quarantine period.

MR. GRAMICCIONI:  That is accurate.  I didn't realize that -- I found that online, Your Honor --

THE COURT:  I know.

MR. GRAMICCIONI:  -- so I don't know why they still have that published.

But I didn't mention the Charleston County Detention Center -- and, again, I don't want to appear as if I'm arguing for custody -- but I didn't know the relationship postsentence.  I know that they have a contract to hold detainees pending -- pending federal trials, but I

didn't know what the practice is after the fact.  Yeah.

THE COURT:  Well, there were so many January 6th defendants from all around the country it has -- the probation office is getting somewhat adept at figuring out what sentencing options are made available in different states --

MR. GRAMICCIONI:  Yes, ma'am.

THE COURT:  -- because in this jurisdiction judges fashion sentences in multiple different ways:  Intermittent confinement on the weekends, intermittent confinement here and there.

We have fashioned -- and the facilities in this area accommodate not just straight prison sentence, and other jurisdictions -- I guess judges in other jurisdictions just do fairly blunt sentencing as opposed to more -- I am going to call it "creative sentencings," and so the probation office was able to determine that.

MR. GRAMICCIONI:  I think the last question the Court had that required answering was -- I spoke to my client.  In terms of crowd funding, he made a total of about $6,000.

And with that, Your Honor, unless you have any questions, I will conclude my argument.  Thank you for your time.

THE COURT:  Okay.  Thank you.

Mr. Johnston.

THE DEFENDANT:  Would you like me to remove my mask, Your Honor?

THE COURT:  Are you fully vaccinated?

THE DEFENDANT:  I am not vaccinated.  I have had COVID --

THE COURT:  Keep your mask on, then, please.

THE DEFENDANT:  Okay.  Your Honor, I absolutely agree with you.  It was not a mere protest; it was not a mere demonstration --

THE COURT:  Just pull the microphone closer to you.

THE DEFENDANT:  Can you hear me now?

THE COURT:  Yes.

THE DEFENDANT:  Your Honor, it was not a mere protest; it was not a mere demonstration.  It was a terrible, terrible occurrence, and -- and I deeply regret coming to it and being any part of it.  I apologize to the Court.  I apologize to the government.  I apologize to the Capitol Police.

THE COURT:  You seemed pretty revved up, Mr. Johnston --

THE DEFENDANT:  I think --

THE COURT:  -- when you were walking down to the Capitol.  And is that because you had been revved up by the

speakers at that rally?

THE DEFENDANT:  Another really bad decision on a day of terrible judgment.

Are you talking about the -- on the place where it says, "We have broken through."

THE COURT:  Yes.

THE DEFENDANT:  That was stupid bravado, Your Honor.  That was stupid puffery on my -- on my part.  I am at fault for it.  That is my voice.  I did not remember that prior to hearing the tape, but that is my voice, that was me.  I did it.  I was wrong.  It was a stupid thing to say, and probably the second stupidest thing I did that day; the first stupidest thing was to walk through the door inside the Capitol.  And I am every bit of the reason I am standing here.  It was me.  I did it, nobody else.  I am to blame.

THE COURT:  Does that conclude your statement?

THE DEFENDANT:  No, ma'am.

Shortly after January 6th, I think a month or so after, I did retain an attorney and say -- and I did discuss with him turning myself in.  He said to just wait for the initial interview by the FBI.  He indicated that they always do an initial interview.  And as soon as they did the initial interview, to simply give them his name, and we would arrange to turn myself in; and that would be it.  And so I was awaiting for that initial interview, and -- and it

never came; I -- it -- it -- they went straight to the arrest.

Also, Your Honor, the -- my cell phone, I saved the contents of my cell phone for over a year. I finally backed everything off on a thumb drive. And either I messed it up, I -- the -- a lot of the stuff that should have been on the thumb drive is not there on the one I found, or else I put stuff on a separate hard -- on a -- on a different hard -- thumb drive, and I just can't find it.

I think I did -- I did the backing off of my phone in February or March of this year, but I saved it up until then. And on the day I was arrested, I -- I said: Here is my phone; and they said, We don't want it. I just -- I found out later why; I didn't realize that. But that's what I did with that.

And I wish -- I wish, Your Honor, that you had asked me some of the questions that you were asking Chris. And I would like to --

THE COURT: Well, I'd be happy to hear any of the answers that you want to give me.

THE DEFENDANT: Your Honor, I don't -- I don't remember all of your questions at this point; I didn't take very good notes, Your Honor.

But it was a -- it was a dumb, dumb thing to do. It was a terrible, terrible lapse in judgment. It was not a

mere protest.  I am not a QAnon person; I am not a social media person.  I didn't necessarily even think that the election was stolen.

I did think, Your Honor, that the powers that be should pump the brakes and maybe took a -- take a look at some of the purported evidence that was being put forward, and that was why I went.

I can't remember whatever else you asked my attorney, Your Honor.

THE COURT:  Okay.  That's all right.  Proceed with your statement.

THE DEFENDANT:  I have let my family down; I have let my community down.

As far as practicing law, Your Honor, I don't think -- I mean, the -- I was arrested on May the 20th.  I think it was on May the 23rd, the Office of Disciplinary Counsel, which is, like, the -- the prosecutor for lawyers, requested that my license be suspended.  I consented to their request; I self-reported to them.  And then they submitted their petition, and I consented to the petition. Your Honor, I don't think they'll ever give it back to me.

I am not a person -- I -- I know there is another place in the -- in the government's brief that I saw where I made a statement about:  This is a politically charged matter.  And what I meant by that, Your Honor, was that

if -- if I opposed the ODC petition to suspend my license, then the Supreme Court of South Carolina, who runs the Bar -- that they would have to make a decision either to suspend it or not.  If they made a decision to suspend it, then somebody would be mad at them; if they made a decision to not suspend it, then somebody would have been mad at them; that's what I meant.  And it wasn't -- you know, they didn't do anything wrong.  So it's a -- in explaining to a reporter who called me from the state newspaper why I consented, I said:  Because this is politically charged, and the Bar is going to catch it either way; and that's not fair, so I am just consenting to it.

And -- and like I said, I doubt -- I doubt seriously I will ever get it back, Your Honor.  I think I am going to have to rebuild my life.  I am going to have to start from scratch and come up with a new career.

I -- I am working in affordable housing, Your Honor, and I like it.  And it does call on some of my skills as a lawyer; it does not require me to be licensed.  And so that's been a -- that's been a very fortunate thing, that that employment came along when it did.

Also, Your Honor, the government had said that -- that I had counseled my neighbor Chad to evade or avoid.  The call that Chad got was actually from his employer, who's a -- who -- at the time he was working for a construction

company.  And they told him that his -- his boss told him, you know:  You are fired.  But if you talk to the FBI and they clear you to come back to work, you can come back to work.

And so what I was saying -- I don't know -- I don't know why I said "immunity."  But what I was saying was:  If -- if that's true, then get your lawyer and -- and go talk to the FBI and -- and make that happen.  If it's not true, then your lawyer will tell you.  But, essentially, what I told him was to get a lawyer that practiced federal law, and discuss that with him.  That -- that was the backstory on that.

But -- but the bottom line here, Your Honor, is that, you know, I am 100 percent responsible for what I did that day.  I am -- sorry, your Honor.  I deeply regret it. I owe this Court and all concerned an apology.

I would like to go forward from here, put this behind me, and rebuild my life anew.  And I -- again, in conclusion, I apologize to the government, to the Capitol police, to this Court, and to my family and friends for my terrible judgment on that sad day.

THE COURT:  And it was a very sad day for the whole country that I think we're still trying to recuperate from.  And it is one of the things that we sentencing judges have to consider, and it's built into the factor of general

deterrence to ensure that we impose a sentence that reflects the seriousness of the conduct.

So I am required, after considering the sentencing memos, presentence investigation report, and under the factors -- under 18 U.S.C. 3553(a), I am required to impose a sentence that's sufficient but not greater than necessary to comply with the purposes of sentencing. And the context of these January 6th cases make it really important to focus on: What are those purposes of sentencing here?

As I said, it's the need for the sentence imposed to reflect the seriousness of the offense and to promote respect for the law -- and I have standing in front of me a practicing lawyer who engaged in the January 6th conduct that shook the democracy and the history of this country of having peaceful transitions of power -- and provide just punishment based on the person standing in front of me.

So I have to be careful that whatever sentence I impose doesn't look like a green light to the world: You can be a practicing lawyer; you can follow when a political leader tells you to walk and march on the Capitol -- just go forward and overrun the law enforcement; go into the Capitol; engage in conduct that results in the evacuation of the Capitol and the Vice President; stop the peaceful transition of power -- that's a pretty weighty decision that all of us sentencing judges in these January 6th cases have

to make.

And when the government says it's an aggravating factor in your case that you were a practicing lawyer, as I said before, I agree.  I agree.

THE DEFENDANT:  I do, too.

THE COURT:  You should have known so much better.

THE DEFENDANT:  I agree with you, Your Honor.

THE COURT:  So I have to consider the nature and circumstances of the offense, your history and characteristics, the types of sentences available, the need to avoid unwarranted disparities among defendants with similar records found guilty of similar conduct, the need to provide restitution.

Here, the restitution payment you have agreed to make is $500; and that's what I am going to impose.  That's pursuant to your plea agreement, and I am going to impose that.

Regarding the nature and circumstances of the offense -- I don't want to beat this dead horse, the government has talked about it, we have talked about it -- I have read to you what the D.C. Circuit has described what happened on January 6th to be:  A riot involving the attack on the Capitol.  And you've acknowledged -- and I appreciate that, quite frankly.  You acknowledge it was a riot; you acknowledge this is not a protest.  And that's a step in the

right direction.

And I think it's important for every defendant with offense conduct from January 6th who stands in front of me appreciates; not everybody does.  So it's a point in your favor to at least recognize that that was not a protest.  It was not a political rally; it was not a demonstration; it was not a picket.  It was a riot; and it had fairly serious consequences for the country, certainly on that day, and in the aftermath.

And when I look at the videotape evidence, the description in the presentence investigation report, the statement of facts, you made it to the Capitol grounds; you passed all the restricted grounds and the fencing that had been up -- whether you saw that or not, I am not sure.  But by the time you got near the Capitol, you saw the bike racks; you saw the police line; you saw the law enforcement arrayed in riot gear trying to keep people behind the bike racks and using their flash-bangs, using their, you know, LRAD loud announcement to tell the crowd to disperse.

And even seeing this mob, this chaos, this melee -- knowing what was going on in the Capitol Building that day and how disruptive this was going to be to that process -- you went forward.  You have forged forward into the building, through a broken door with broken glass on either side; you had to leave through one of those broken

windows.

You went into the Crypt, you went into the Crypt lobby, you went into the Visitor Center. And along the way, you saw other police lines; you saw police trying to block the mob from going in. And instead of hightailing it -- hightailing it out of that building -- to stop this illegal conduct, the fact that you stuck around in there for 30 minutes -- and that's 30 minutes of law enforcement desperately trying to protect people legitimately working there and desperately trying to get people out, as they're overrun and calling for backup and National Guard -- you were a part of that. It's a terrible day. And I hope you realize how shocking your conduct was that day.

THE DEFENDANT: I do, Your Honor.

THE COURT: So the government has gone in detail into the conduct that you engaged in that day. I counted up the number of times, quite frankly, that you saw, you know, police lines being overrun, starting with when you were outside. And one of the -- I guess a video taken by your codefendant moving towards the doors, and one of the rioters around say: They got in. We have breached the doors. And that's when you said, "We have broken past the barriers, we have breached the doors of the Capitol." So that was the first time you saw that the police lines were broken in.

And then -- when you were inside the Crypt, the

police line had been broken in, and people were running around and chanting and whistling.  And that was a second police line, in the Crypt, where you were responsible for helping the mob break the police line.

And then the third time is when -- in the Crypt lobby, when the bay doors were rolling down.  You saw police on one side of the bay doors trying to get those bay doors down, and other rioters putting the chairs and flag poles and -- you know, trying to stop the bay doors from going down.  And they successfully stopped the bay doors from going down, and rioters got further into the building.  So that was the third time.

And then the fourth time was when you actually saw a police officer subdue a rioter -- that's four times.  I mean, this is not like some of the defendants I have had from January 6th who literally were in for five, ten minutes; didn't really see very much at all, and then left. Didn't really see -- they came in afterwards.  It was so late in the day, they actually didn't see the police lines being broken.  But you were pretty aggressive there right at the front of this mob, seeing all of this; and that is all aggravating conduct given your background.

You do have a long history of employment.  The letters I have gotten from you rave about what a good community member you are.  Your current boss, in the most

recent letter, has a glowing letter about you.

I appreciate that you have lost your law license; you have had it suspended now, and that that's a significant change in your work. But you have all of the ingredients from a family, a community, church, an employer who likes you -- to reframe your life and, hopefully, learn from this experience to be more skeptical when political leaders are telling you falsehoods before you just jump to --

THE DEFENDANT: Yes, Your Honor.

THE COURT: -- to violate the law.

I mean, I have seen a number of defendants in front of me who have gotten carried away with this mob conduct on January 6th. We do expect more from lawyers and from people who are educated in the law not to engage in conduct like that and listen to the police and the law enforcement, particularly when you see the context and the circumstances of what they were confronting that day.

Regarding the types of sentences available, with a petty offense, you can be sentenced to a maximum term of imprisonment of six months or up to five years' probation. The government has taken the position that both a term of probation and a term of imprisonment, straight imprisonment, can be imposed for a petty offense -- it's what we call the split sentence bar issue, which is an issue I have not decided, although almost all of my colleagues on this bench

who have looked at the issue have decided and agreed with the government that it's appropriate.

I don't believe that a long enough prison term is warranted in your case to have to decide the split sentence issue, but I do believe some term of imprisonment is appropriate in your case given all of the circumstances that we have discussed.

Regarding the need to avoid unwarranted sentence disparities, there have been a wide range of sentences, both probationary and custodial sentences -- and a mix of both -- that have been imposed on defendants convicted of the petty offense of parading and picketing. In your case, I do believe that 36 months of probation would be appropriate to ensure you're subject to supervision for a fairly lengthy period of time, through at least the next election cycle, so that there -- you are under supervision not to engage in any more political violence like that which occurred on January 6th.

Due to the aggravating circumstances, I will include a special condition of 90 days of home detention.

I am also going to impose a period of 21 days of intermittent confinement, which I will require to be served in one 14-day period and one 7-day period.

And given the research that my probation office has done about where intermittent confinement can be

provided with no quarantine period, I am going to recommend that that be served at the Charleston Detention Center.

So based on my consideration of these and other factors, I will now state the sentence to be imposed.

Pursuant to the Sentencing Reform Act of 1984 and in consideration of the provisions of 18 U.S.C. Section 3553, it is the judgment of the Court that you, David Charles Johnston, are hereby sentenced to a term of 36 months of probation on Count 4, with special conditions that:  During the first year of probation, you will serve 21 days of intermittent confinement at a facility designated by the Bureau of Prisons, which I recommend to be the Charleston Detention Center, in two periods; with the first period being 14 days and the second period being 7 days, and 90 days of home detention.

In addition, you are ordered to pay a special assessment of $10 in accordance with 18 U.S.C. Section 3013.

The Court authorizes -- while on supervision you shall abide by the following mandatory conditions, as well as all discretionary conditions recommended by the probation office in Part D, Sentencing Options of the Presentence Report, which are imposed to establish the basic expectations for your conduct while on supervision.

The mandatory conditions include:

You must not commit another federal, state, or

local crime; you must not unlawfully possess a controlled substance; you must make restitution in accordance with 18 U.S.C. Section 3663 and 3663A, or other statute authorizing a sentence of restitution.  And there is one other mandatory condition -- well, I guess those are the three mandatory conditions.

You must serve a total of 21 days of intermittent confinement, which will be served for two periods; the first of 14 days and the second of 7 days, at a facility designated by the Bureau of Prisons; and you must follow the rules and regulations of the facility of which you are designated.

You will also be monitored as soon as practicable by the form of location-monitoring technology indicated for a period of 90 days, and you must follow the rules and regulations of the location-monitoring program.  The cost of the program is waived.

Location-monitoring technology will be selected at the discretion of the probation officer, including radio frequency, or RF monitoring; GPS monitoring, including hybrid GPS; SmartLINK; or voice recognition.  This form of location-monitoring technology will be used to monitor the following restriction on your movement in the community:

You are restricted to your residence at all times, except for employment, education, religious services,

medical, substance abuse or mental health treatment, attorney visits, court appearances, court-ordered obligations, or other activities as preapproved by the probation officer.

You must disclose to the probation officer access to any requested financial information and authorize the release of any financial information.  The probation office may share financial information with the U.S. Attorney's Office.

You shall remove any firearms, destructive devices, or other dangerous weapons from areas over which you have access or control until the term of supervision expires.

You are ordered to pay a fine in the amount of $2500.  The Court determines you do not have the ability to pay interest and, therefore, waives any interest or penalties that may accrue on the balance.

You are ordered to make restitution, as I have said, in the amount of $500 to the Architect of the Capitol. The Court determined you do not have the ability to pay interest and, therefore, waives any interest or penalties that may accrue on the balance.

Restitution payments shall be made to the Clerk of the Court for the U.S. District Court, District of Columbia, for disbursement to the following victim:  Architect of the

Capitol, in the amount of $500, Office of the Chief Financial Officer, attention Kathy Sherrill, CPA, Ford House Office Building, Room H2-205B, Washington, D.C. 20515.

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:  Payment in monthly installments of $150 to commence 30 days after the date of judgment.  The financial obligations are immediately payable to the Clerk of the Court for the U.S. District Court, 333 Constitution Avenue Northwest, Washington D.C. 20001.  Within 30 days of any change of address, you shall notify the Clerk of the Court of the change until such time as the financial obligation is paid in full.

The probation office shall release the presentence investigation report to all appropriate agencies, including the U.S. Probation Office in the approved district of residence, in order to execute the sentence of the Court. Treatment agencies shall return the presentence report to the probation office upon the defendant's completion or termination from treatment.

Pursuant to 18 U.S.C. Section 3742, you have the right to appeal the sentence imposed by this Court if the period of imprisonment is longer than the statutory maximum. If you choose to appeal, you must file any appeal within 14 days after the Court enters judgement.

As defined in 28 U.S.C. Section 2255, you also have the right to challenge the conviction entered or sentence imposed if new and currently unavailable information becomes available to you or on a claim you received ineffective assistance of counsel in entering a plea of guilty to the offense of conviction or in connection with sentencing.  If you are unable to afford the cost of an appeal, you may request permission from the Court to file an appeal without any cost to you.

Are there any objections to the sentence imposed not already noted on the record from the government?

MS. AKERS:  No, Your Honor.

THE COURT:  From the defense?

MR. GRAMICCIONI:  No, Your Honor.

THE COURT:  All right.  You may be seated, Mr. Johnston.

THE DEFENDANT:  Thank you, Your Honor.

THE COURT:  Does the government have a motion to dismiss the open counts?

MS. AKERS:  Yes, Your Honor.

The government moves to dismiss Counts 1 through 3 of the information.

THE COURT:  That motion is granted.  Those counts will be dismissed.

Is there anything else to address today from the

government?

MS. AKERS:  Nothing, Your Honor.  Thank you.

MR. GRAMICCIONI:  No, Your Honor.  Thank you.

THE COURT:  Okay.  You are all excused.

(Whereupon, the Court and staff confer.)

THE COURT:  Okay.  There is a special assessment of $100, just to make sure that's clear on the record.

No, no, no.  It's not $100, it's $10.  You are right, I didn't mention the $10.

Thank you.

(Whereupon, the proceeding concludes, 10:58 a.m.)

                    CERTIFICATE


I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings to the best of my ability.

This certificate shall be considered null and void if the transcript is disassembled and/or photocopied in any manner by any party without authorization of the signatory below.

Dated this 25th day of January, 2023.

/s/ Elizabeth Saint-Loth, RPR, FCRR
Official Court Reporter